No. 21,091.

THE ELDER MERCANTILE COMPANY, *Appellee*, V. THE OTTAWA INVESTMENT COMPANY et al. (THE DOBSON INVESTMENT COMPANY, THE STATE BANK OF OTTAWA and F. C. DOBSON, *Appellants*,) (S. D. PEACOCK and HOWARD W. PEACOCK, Partners as PEACOCK & SON, et al., *Appellees*.)

SYLLABUS BY THE COURT.

1. CONTRACT—*Construction of Building—Suspension of Work by Owner —Not an Abandonment.* When the owner or real estate begins the construction of a building thereon, and for want of funds to continue its construction or for other reason suspends the work, but with an intention and desire to complete it as soon as possible, and later contracts with a building firm for such completion which is begun, *held*, that as to such owner such suspension does not constitute an abandonment of the work.

2. BUILDING CONTRACT—*Suspension of Work—Mechanics' Liens.* When the materialmen are not advised and do not know of such intention and desire to complete the building, they may treat the work as abandoned and file liens.

3. BUILDING CONTRACT — *Suspension of Work* — *New Contractor* — *Materialmen's Liens.* When, after so treating it and so filing their liens, they contract with a building firm which contracts with the owner to complete the building, and agree with such firm, with the knowledge and coöperation of the owner, to furnish labor and material to complete the building, their former liens being recognized by such firm and owner, then upon abandonment of the work by such firm such materialmen may have liens for all the labor and material furnished.

4. SAME—*Mechanics' Liens*—*Rights of Materialmen.* When in such contract to furnish labor and material for the completion of the building the materialmen agree not to file liens on the assumption that a certain bond will be given by such firm as required by its contract with the owner, they are not required to take notice of the failure to give such bond, but on ascertaining such failure may file their liens, their waiver so to do being contingent on the fulfillment of the contract to give such bond.

5. SAME—*Priority of Liens.* The company which began the construction of the building agreed with the firm which contracted for its completion to pay, therefor certain bonds which were to be a first lien on the property, and agreed to see that an existing mortgage thereon should be released. When the materialmen contracted with reference to the completion of the building they knew of this provision. The owner and the holders of the first bonds were aware and had visual knowledge of the work of completion and that the materialmen were putting their labor and material into the building, but failed to have such first mortgage released. *Held,* that the trial court did not err in giving the holders of such first lien a second lien, the building firm the third, and the materialmen concurrent first liens for their respective claims.

6. SAME—*Mechanics' Liens*—*Rights of Subcontractors.* While a subcontractor must take notice of the contract between his principal and the owner of the property, he is not bound by all of its terms, neither is he bound to know of its nonfulfillment.

7. SAME—*Mechanics' Liens*—*Rights are Statutory.* While mechanics' liens and the rights thereunder are statutory, their foreclosure and adjustment are not governed exclusively by the rigid rules of law, but to them are also applied the familiar principles of equity.

8. SAME—*Materialmen's Liens*—*Amount of Recovery.* A claim for material which adds to its actual cost a profit of twenty per cent thereof is not, in the absence of proof, to be deemed unfair or unreasonable.

9. SAME. A profit of twenty per cent on that portion of the material not furnished because of abandonment of the work by the contractor, can not legally be allowed the subcontractor.

Appeal from Franklin district court; CHARLES A. SMART, judge. Opinion filed May 12, 1917. Affirmed with modification of one item.

Mercantile Co. v. Investment Co.

*Wilbur S. Jenks,* of Ottawa, *A. E. Crane, Oscar Raines, R. F. Hayden,* all of Topeka, and *Robert S. Heizer,* of Osage City, for the appellants.

*F. M. Harris, J. L. Shelden, W. B. Pleasant, Ralph E. Page, Curtis M. Oakes,* all of Ottawa, and *Charles Carroll,* of Louisville, Ky., for the appellees.

The opinion of the court was delivered by

WEST, J.: Of the numerous defendants the Dobson Investment Company, State Bank of Ottawa and F. C. Dobson appeal from certain judgments in favor of a number of materialmen in litigation arising out of the construction of a building on ground formerly owned by the bank. The assignments of error chiefly relied on have reference to the priority of liens and to the amount of judgment rendered in favor of the Elder Mercantile Company. The parties and issues were so numerous that the court made thirty-eight findings of fact and nineteen conclusions of law.

The State Bank of Ottawa owned a certain lot. The Ottawa Investment Company was organized with substantially the same membership as that of the bank, with a capital stock of $10,000, the lot being purchased for $7500 in money and constituting the assets of the investment company. The latter company, desiring to build on the lot, had plans made and executed a trust deed to secure the payment of $50,000, which deed was placed of record. The work began, and before any money was secured the State Bank paid the bills as they came in for the labor and material going into the building. The investment company deposited $10,000 of the bonds as security for the advances, borrowed $5000 from a Kansas City bank; the company and its president, C. F. Dobson, indorsed the note individually and caused the company to deposit $5000 of the bonds with the Kansas City bank, and the money so borrowed was placed in the State Bank to cover an overdraft. Soon the overdraft grew to $10,000, and the note for $5000 having become due, it was paid by Dobson, who took it up and also the $5000 bonds, the investment company consenting that he should hold these as security, and later, by agreement with Dobson, the bank and the investment company, the bank became the owner of the $10,000 bonds which had been de-

posited with it and Dobson became owner of the $5000 bonds held by him as security, and the indebtedness of the investment company to Dobson and the bank was canceled. On June 1, 1914, the work on the building ceased. The materialmen had made agreements with the investment company to furnish material, and liens therefor were filed. Late in September the investment company contracted with Peacock & Son, with the consent of Dobson and the State Bank, to complete the building according to the original plans unless thereafter modified. In payment the investment company was to issue bonds in the sum of $65,000, secured by a first-mortgage lien on the real estate, building and contents, and issue its preferred stock to the amount of $35,000. The contract contained a stipulation that all bonds of the existing issue then outstanding and the mortgage securing the same should be canceled. Dobson was to accept in lieu of his $5000 of the old bonds a promissory note of the investment company for that amount. The investment company was to secure the consent and agreement of the State Bank to accept $10,000 of the new bonds for $10,000 of the old bonds held by it. The obligation of the contractors to proceed with the construction of the building was conditioned upon the retirement and cancellation of the other bonds and upon the contractors' being able to make satisfactory settlement of the obligations and debts of the investment company. The contract contained a warranty that the title was clear save the mortgage for the $50,000 bond issue, only $17,500 of which was outstanding. The contract also contained this provision:

"All materials now in said building or on the ground or in the street or otherwise furnished or delivered to said company for the purpose of constructing or erecting said building shall be and become the property of said contractors as part of the consideration of this contract and said company agrees to put said contractors in possession of the said building for the purpose of said construction and in possession of the said property and warrants the title of said property to said contractors subject to the aforesaid claims."

Shortly after the signing of this contract it was suggested that the investment company did not have legal authority to issue the bonds and stock provided for, and thereupon, at the suggestion of the Peacock firm, the Dobson Investment Com-

Mercantile Co. v. Investment Co.

pany was organized out of the same personnel as had consti-
tuted the Ottawa Investment Company, capitalized at $65,000.
At this time Dobson was vice president of the bank, and Fin-
ley, a member of the Dobson company and the investment
company, was its cashier.   The bank had been consolidated
with another, and in February, 1915, was transacting business
across the street from the incompleted building involved
herein, and the bank officials at all times knew that Peacock
& Son were proceeding with its completion, and Dobson and
Finley and the bank knew that Peacock & Son had not fur-
nished the surety bond for the faithful handling of the stock
and bonds and for the completion of the building mentioned in
the contract between them and the investment company.   The
Dobson Investment Company issued a trust deed upon the real
estate in question, signed by Dobson as president and Finley
as secretary, which trust deed recited that it was a first lien
upon the real estate.   It was executed June 25, 1915, and re-
corded August 18 following.    The assets of the investment
company were transferred to the Dobson company in April,
1915.   October 31, 1914, the Elder Mercantile Company con-
tracted with Peacock & Son for the completion of the heating,
plumbing, gas fitting and compressed-air vacuum lines, having
heretofore perfected a lien for the work done before the con-
struction of the building ceased, June 1, 1914.   Under this
contract of October 31, 1914, the bond, which under the former
contract Peacock & Son were to furnish assuring the early
completion of the building, was waived, and the agreement
that if Peacock & Son were paid in bonds they need not pay
the Elder Mercantile Company until they realized on such
bonds, was stricken out of the original contract, and it was
agreed, among other things, that payment for work, material
and labor should be made as otherwise provided in such origi-
nal contract.   Under the contract thus modified the Elder
Mercantile Company furnished labor and material to a large
amount.   Peacock & Son abandoned the work about December
15, 1915.   They failed to give the Dobson Investment Company
or the Ottawa Investment Company the bond provided for in
the contract of September 24, 1914, and the bank and invest-
ment company and Dobson refused to surrender the bonds of
the Ottawa Investment Company and to have the mortgage

securing such bonds released of record. In August, 1915, the Dobson Investment Company delivered to Peacock & Son $40,000 of the bonds of the Dobson company on condition that such delivery should not operate as a waiver of the right to the bond already mentioned. The court found that the work done by Peacock & Son on the building and the work and material furnished by the lien claimants added to its value $15,000, and that to complete the building as it stood at the time of the trial, according to the plans, would cost about $32,000. The court concluded that by the contract of September 24, 1914, Peacock & Son assumed the obligations of the Ottawa Investment Company for labor and material that had theretofore gone into the building. Judgments were rendered for the various lien holders. The State Bank of Ottawa, F. C. Dobson and the Ottawa Investment Company were given judgments for the amounts due them, such judgments to be second liens upon the property in question. Peacock & Son's judgment was decreed to be the third lien, and the materialmen were decreed to have concurrent liens prior to both.

It is claimed that the contractors and subcontractors abandoned the work on June 1, 1914. But the court found that no steps were taken to resume the work until the 24th of September, when the investment company entered into a written contract with Peacock & Son. That the time intervening between this and the date of actual resumption of work "was consumed by the organization of the new company, the preparation of the bonds and trust deeds, a vast amount of correspondence between the Peacocks and their attorney in Cincinnati, Ohio, . . . and many other details in connection with the transaction carried on almost exclusively by correspondence."

It was the Ottawa Investment Company which was constructing the building, and while the work ceased it was not from any purpose or intention on its part to abandon it, for the contract with the Peacock firm provided for the completion of the work according to the original plans and also recognized the claims of the materialmen whose liens had been filed after the work had ceased. The contract recited that the investment company was indebted to certain persons for labor and material furnished for the building in the sum of

$5433.16; that the title to the real estate was clear save for the mortgage of $50,000, and that "any other debts or liabilities of said company, or any amount for which liens of either head of subcontractors or materialmen or others can be claimed or taken or otherwise asserted on said real estate or building or any part thereof, do not exceed in the aggregate the sum of fifty-four hundred thirty-three and $^{16}/_{100}$ ($5433.16) dollars."

The contract between the Peacock firm and the Elder company recited:

"There having already been furnished labor and material on above contracts to the amount of Fourteen Hundred Fifty-three Dollars and Sixty-six cents ($1453.66) with 6% interest from July 16th, 1914; that the said Elder Mercantile Co., agrees to cancel their lien upon the filing of a sufficient bond assuring the early completion of the building, with the understanding that they will be paid that amount on the completion of the building and will continue the above mentioned contracts."

Thus it appears that both the Peacock firm and the company with which it contracted recognized the claims and liens of the Elder Mercantile Company when arrangements were made for resuming the work and completing the building. The investment companies and the Peacock firm having by their contracts and by their actions recognized and treated the province of the Peacock firm as one to complete and not to begin the construction of the building, and having recognized the rights of the materialmen to the amounts for which they had filed liens, such materialmen, upon furnishing more labor and material, would plainly have the right when the work was finally abandoned by the Peacock firm to file liens for such additional labor and material as they had furnished. While in a technical sense it might be said that the liens filed before the Peacock firm came into the matter were premature, this, even if so, would make no substantial difference, owing to the recognition of their claims and liens by all concerned. In other words, when the work ceased on June 1, 1914, if the materialmen had no knowledge or notice of any intention of the Ottawa Investment Company to proceed further with the building or any reason to think that the work had been abandoned they were justified in filing the liens. (*Davis v. Bullard,* 32 Kan. 234, 4 Pac. 75; *Shaw v. Stewart,* 43 Kan. 572, 23 Pac.

616; *Lumber Co. v. Savings Bank*, 52 Kan. 410, 34 Pac. 1045; *Hotel Co. v. Hardware Co.*, 56 Kan. 448, 43 Pac. 769.)

On the other hand, if, as the fact appears, the Ottawa Investment Company had no intention or purpose of abandoning the work, but intended to provide for its completion as soon as possible and did not so advise the materialmen it could not complain because they filed liens on the theory of abandon-ment. But, however this may be, having in fact proceeded to contract for the completion of the building and then having recognized the claims and liens of the materialmen, and the firm with which they contracted having likewise recognized them, it would certainly be harsh and unfair to hold that on the mere question of the time of their filing such claims or liens should be avoided or impaired.

It is forcibly contended that as the mortgage securing the original bonds held by the appealing defendants was of record the lien claimants were bound to take notice thereof and have no right to priority thereover. It is quite true that the lien of a materialman may not ordinarily supersede an existing mortgage upon property for the improvement of which he furnishes labor or material, but this is not an ironclad rule which under no circumstances can have an exception. In this case the officers of the bank, and of the investment companies, and Mr. Dobson himself were largely the projectors and managers of the entire building scheme. Practically the same men who constituted the bank constituted in turn the two investment companies, Mr. Dobson and Mr. Finley being prominent in all three, all having actual and visual knowledge of the progress of the work; and when the contract with the Peacock firm provided that the bonds of the Dobson Investment Company should be a first lien on the property, then certainly as between the complaining parties and that firm the Dobson Investment Company bonds would take precedence over the Ottawa Investment Company bonds. It is urged, however, that all the lien claimants knew of the contract between the Ottawa Investment Company and the Peacock firm and referred to it in their contracts, and by their admissions therein are estopped to deny the validity of the original mortgage. It is argued that as the labor and material to finish the building were to be paid for in stock and bonds of the Dobson Invest-

ment Company, the subcontractors were bound to take notice
of this agreement, and had no right to file liens against the
property. It is further contended that in all but three of the
contracts with Peacock & Son the subcontractors waived the
right to file mechanics' liens, and that having done this they
could not afterwards change their minds and file liens which
could be recognized by law. Bloom, in his supplement to the
Law of Mechanics' Liens, page 223, says:

"An agreement to waive the lien of one who performs labor upon or
furnishes materials for a building must be certain and must be clearly
and unequivocally established; and if such agreement is subject to con-
ditions subsequent which are not performed by the other party the
claimant does not waive his lien." (*Concord Apartment House Co. v.
O'Brien*, 128 Ill. App. 437; *Nice v. Walker*, 153 Pa. 123; *Holm v. Chicago,
Milwaukee & P. S. R. Co.*, 59 Wash. 293; *Pacific Lumber & Timber Com-
pany v. Dailey*, 60 Wash. 566.)

As Peacock & Son failed to carry out their part of the con-
tract to furnish bond, it is argued that in effect the subcon-
tractors failed to carry out their agreement; that it was their
duty to see that the original contract was fully performed;
that if it had been fully performed they would not have been
entitled to a lien, and that by failure to carry it out they should
have no greater rights. This provision to pay in bonds was
stricken out of the second contract between the Peacock firm
and the Elder company. The court found that Peacock & Son
wholly failed to give the Dobson Investment Company or the
Ottawa Investment Company the bond provided for, and by
reason of such failure the State Bank, the Ottawa Investment
Company and Dobson refused to surrender their bonds and to
have the mortgage securing them released. The court further
found that the Dobson Investment Company delivered $40,000
of its bonds, although without waiving the right to the bond
agreed to be furnished by the Peacock firm. Also, that in each
of the contracts between Peacock & Son and the lien claimants
the latter agreed that they would not take or assert any lien,
but that they made these contracts relying on the terms and
conditions of the contract between the Peacock firm and the
Ottawa Investment Company and did not waive their right to
liens except upon condition that such contract be complied
with. The court expressly found that none of the lien claim-
ants except the Elder company had any knowledge while per-

forming labor and furnishing material that Peacock & Son had failed to furnish the bond provided for in their contract with the investment company or that the bank and Dobson had failed to have the mortgage of the Ottawa Investment Company cancelled. The court concluded as matters of law that the Peacock firm assumed the obligations of the Ottawa Investment Company for labor and material already furnished, that the appealing defendants should have judgment for the amount of their bonds and a second lien therefor upon the property, and that the Dobson Investment Company bonds should be canceled. It would seem, therefore, that the lien claimants proceeded on the theory that the contract between the investment company and the Peacock firm would be or had been complied with. While doubtless it was their duty to take knowledge of the contract, we know of no rule which requires them to take notice of its violation or nonfulfillment.

"A person making a subcontract is presumed to make it knowing the agreement of the principal contractor, but no subsequent agreement of the principal contractor can be set up to the subcontractor's disadvantage." (*Shaw v. Stewart*, 43 Kan. 572, 579, 23 Pac. 616.)

A subcontractor's rights will not be affected by any subsequent agreement between the owner and contractor to which they have been assigned or by any act of waiver of the original contractor. (*Nixon v. Cydon Lodge*, 56 Kan. 298, 43 Pac. 236.)

"His subcontract is subordinate to the principal contract with the owner, and is presumed to be made with knowledge of its existence, although he is not bound by all of its terms." (*Lang v. Adams*, 71 Kan. 309, 311, 80 Pac. 593.)

The parties most interested in the construction and completion of the building were the ones who best knew of this noncompliance and also knew that these claimants were putting their labor and material into the building and would naturally expect to be paid therefor. Having permitted this situation to continue, having without advising them of the failure of the Peacock firm to furnish the bond permitted the materialmen to add their property to the betterment of the building, it would seem most inequitable to permit these parties now, by reason of the failure of the Peacock firm to give the bond which they contracted to give, to step in ahead of the lien

Mercantile Co. v. Investment Co.

claimants with the mortgage which was retained after having expressly contracted that the Dobson Investment Company mortgage should be a first lien.

The mortgagee may safely witness the construction of a building upon the property mortgaged and the use of material therefor furnished subsequent to the date of his mortgage, but if instead of merely resting on the priority of his security he agree with the contractor that his mortgage is to be a second lien, and knowingly permit the materialman to act on the strength of his agreement that the contractor is to have the first lien, it certainly can not lie in the mouth of the mortgagee thereafter to claim a lien superior to that of the materialman.

While mechanics' liens and the rights thereunder are statutory, their foreclosure and adjustment are not governed exclusively by the rigid rules of law, but to them also apply the familiar principles of equity. In the cited case of *Shaw v. Stewart,* this language was used:

"The foreclosure of a mechanics' lien under the statute is an equitable proceeding, in which the powers of the court are evoked to mould the remedy, within the provisions of the statute, to suit the circumstances of the case. In this action the equities are with the plaintiffs." (p. 578.)

In *Lumber Co. v. Arnold,* 88 Kan. 465, 129 Pac. 178, it was said:

"It is true, as suggested, that a lien for labor or materials can only attach by virtue of the statute as applied to the facts, and that no lien of this kind can be created by force of equitable rules. At the same time courts are established for the purpose of doing justice and not to assist a party to obtain an unconscionable advantage; and in a case like this slight circumstances might be considered sufficient evidence that the holder of the legal title acquiesced in the purchaser taking possession of the lots and in contracting for the material. If he permitted the purchaser to take possession under the oral contract and to make the improvements he ought to be estopped to deny that the purchaser obtained the equitable title." (p. 471.)

Within the spirit of these declarations the lien claimants are entitled to priority.

In the claim of the Elder Mercantile Company the actual cost constituted one item to which was added twenty per cent profit. Some criticism is made of this, but certainly it can not be expected that materialmen are to furnish their goods without any profit whatever, and there is no showing that twenty per cent

is an unfair or unreasonable charge in this respect, and therefore it was not error to allow it. However, an additional charge of $860.85 was made for twenty per cent profit on the balance of the uncompleted contract, that is to say, if the Elder company had been permitted to go ahead and furnish $4304.29 worth more of material it would then have been entitled to a profit thereon of twenty per cent, or $860.85. As this amount was not furnished, and as the material which otherwise would have gone into this building was still the property of the company, no ground exists for charging this twenty per cent profit on something which never was furnished or used.

Various other points are argued but under the circumstances do not need to be considered.

No error appears in the record touching the matters complained of save the excess claim just referred to.

The judgment, modified by deducting from the lien of the Elder Mercantile Company $860.85, is affirmed.